# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| ARCH DEVELOPMENT CORP. *and* <br> DANA-FARBER CANCER <br> INSTITUTE, INC., | ) <br> ) <br> ) <br> ) | |
| Plaintiffs, | ) <br> ) | No. 15-cv-6597 |
| vs. | ) <br> ) | Hon. Judge Andrea R. Wood <br> Hon. Magistrate Judge Mary M. Rowland |
| GENENTECH, INC., *and* <br> OSI PHARMACEUTICALS, LLC, | ) <br> ) <br> ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

## DEFENDANTS' JOINT
## OPENING CLAIM CONSTRUCTION BRIEF

**TABLE OF CONTENTS**

Introduction ................................................................................................................1

Background ................................................................................................................2

Legal Standard ...........................................................................................................5

Argument ...................................................................................................................7

    I.   The parties are in agreement with respect to eight claim terms. ..................7

    II.  The '512 patent's broad use of "patient" encompasses
         a "human or animal." .....................................................................................8

    III. "A therapeutically effective amount" means "an amount that
         would be sufficient to have a desired therapeutic effect." ..........................10

        A.  Defendants' construction reflects the plain and ordinary meaning. ....11

        B.  Nothing in the specification is contrary to the ordinary meaning
            of "therapeutically effective amount." .................................................12

Conclusion ...............................................................................................................14

## TABLE OF AUTHORITIES

**CASES**      **PAGE(S)**

*Abbott Labs. v. Syntron Bioresearch, Inc.*,
    334 F.3d 1343 (Fed. Cir. 2003).................................................................................13

*Acorda Therapeutics v. Alkem Labs. Ltd.*,
    No. CV 14-882-LPS, 2016 WL 1045356 (D. Del. Mar. 16, 2016) .................11

*Astra Aktiebolag v. Andrx Pharms., Inc.*,
    222 F. Supp. 2d 423 (S.D.N.Y. 2002)..............................................................11

*AstraZeneca AB v. Dr. Reddy's Labs., Ltd.*,
    No. CIV.A.05-5553 JAP, 2010 WL 1981790 (D.N.J. May 18, 2010) ............11

*Aventis Pharma S.A. v. Hospira, Inc.*,
    675 F.3d 1324 (Fed. Cir. 2012)..........................................................................6

*Cardinal Chem. Co. v. Morton Int'l, Inc.*,
    508 U.S. 83 (1993)............................................................................................13

*Fonar Corp. v. Johnson & Johnson*,
    821 F.2d 627 (Fed. Cir. 1987)..........................................................................13

*Helmsderfer v. Bobrick Washroom Equip., Inc.*,
    527 F.3d 1379 (Fed. Cir. 2008)..........................................................................5

*IGT v. Bally Gaming Int'l, Inc.*,
    659 F.3d 1109 (Fed. Cir. 2011)........................................................................13

*K-2 Corp. v. Salomon S.A.*,
    191 F.3d 1356 (Fed. Cir. 1999)..........................................................................5

*Markman v. Westview Instruments, Inc.*,
    517 U.S. 370 (1996)............................................................................................5

*Novartis Pharms. Corp. v. Apotex Corp.*,
    No. 02 Civ. 8917, 2006 WL 626058 (S.D.N.Y. Mar. 13, 2006) .....................11

*Novo Nordisk v. Eli Lilly & Co.*,
    No. 98-cv-643, 1999 WL 1094213 (D. Del. Nov. 18, 1999).......................8, 9

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
    521 F.3d 1351 (Fed. Cir. 2008).......................................................................10

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005).............................................................5, 6, 7

– iv –

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
    789 F.3d 1335 (Fed. Cir. 2015)..........................................................................7

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
    135 S. Ct. 831 (2015).........................................................................................5

*Thorner v. Sony Comput. Entm't Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012)........................................................................13

*Trustees of Columbia Univ. in City of New York v. Symantec Corp.*,
    811 F.3d 1359 (Fed. Cir. 2016)..........................................................................9

**INTRODUCTION**

Twenty-two years ago, in 1994, Plaintiffs filed the original patent application that led to the asserted U.S. Patent No. 7,838,512 (the "'512 patent," J.A. 2-37). The patent's claims are broadly directed to methods of treating cancer using a combination of two types of drugs. The first type, a chemotherapeutic DNA damaging agent, had been used for many years in cancer chemotherapy. The second type, a tyrosine kinase inhibitor, was a class of potential drugs that had emerged in the 1970s and 1980s, but by the early 1990s had not yet been approved for use in humans. Plaintiffs did not purport to invent any of these drugs. Instead, without providing any data establishing anti-cancer effects in humans, animals, or even cell cultures, they claimed *using* any combination of these two types of drugs to improve chemotherapeutic treatment outcomes.

In contrast to the '512 patent, which does not disclose any new compound for treating cancer, Defendants Genentech, Inc. and OSI Pharmaceuticals, LLC ("Defendants") developed a new tyrosine kinase inhibitor called Tarceva® (erlotinib). They obtained approval from the U.S. Food and Drug Administration to use Tarceva® on its own to treat various cancers and to use Tarceva® in combination with a drug called gemcitabine to treat a particularly deadly form of cancer—pancreatic. Nearly ten years after Defendants obtained FDA approval for the pancreatic cancer indication, Plaintiffs sued Defendants for infringing the '512 patent.

As Defendants will eventually show, the '512 patent suffers from several problems. For example, other researchers had published studies using chemotherapeutic DNA damaging agents in combination with tyrosine kinase inhibitors to treat cancer long before Plaintiffs filed their patent application, which claimed these same treatments. Plaintiffs' patent application also includes only a sparse disclosure of the alleged invention that is insufficient to entitle Plaintiffs to the '512 patent's broad claims.

Both of these shortcomings, as well as others, turn in part on what the terms in the '512 patent's claims mean. That is the basis of this claim construction dispute. In an attempt to preserve the claims' validity, Plaintiffs are trying to make their inappropriately broad claims appear less broad by advancing unduly narrow constructions. Defendants, in contrast, are proposing constructions that are consistent with the plain meaning of the claim terms in the context of the intrinsic record. Defendants' constructions properly hold Plaintiffs to the full scope of their broad claims.

These contrasting approaches manifest themselves in two ways.[1] ***First***, Defendants' proposed construction of the term "patient" includes animals, based on explicit discussion in the '512 patent of "animal or human patient[s]." Plaintiffs have proposed a different definition, "the recipient of any of various personal care services," which lacks any grounding in the specification. ***Second***, Defendants' proposed construction of "a therapeutically effective amount" of a tyrosine kinase inhibitor is "an amount that would be sufficient to have a desired therapeutic effect," but Plaintiffs seek to narrow the term by requiring the amount to "kill cells."

Unlike Plaintiffs' strained constructions, Defendants' proposals are true to the '512 patent's claim language, its specification, its file history, and the general understanding of a person of ordinary skill in the art in 1994. Defendants respectfully ask that the Court adopt their proposed construction for each disputed claim term.

## BACKGROUND

The '512 patent purports to provide "strategies for the improvement of chemotherapeutic intervention" using "the combination of a DNA damaging agent and a tyrosine kinase inhibitor."

---

[1] The parties have agreed on claim constructions for "intracellular"/"intracellularly," "apoptosis," "low molecular weight," "chemotherapeutic DNA damaging agent," and "downstream effector molecules." The parties have also agreed that the Asserted Claims' preambles and "thereby improving chemotherapeutic intervention" are non-limiting.

('512 patent at 4:26-29, J.A. 25.) It does not claim any new drugs, but instead claims methods of treatment using a combination of types of drugs that were already known.

The first type of drug in the claimed combination, a "chemotherapeutic DNA damaging agent," is what one normally thinks of as "chemo." According to the '512 patent, treatment with these agents "involve[s] damaging the DNA of the cancer cell." (*Id.* at 1:33, J.A. 24; *see also id.* at 3:53-60, J.A. 25.) Despite being a mainstay of cancer treatment for decades, these agents had "limited effectiveness" because the "cellular response to DNA damage includes," among other things, "activation of DNA repair" processes. (*Id.* at 1:27, 33-35, J.A. 24.)

The second type of drug in the claimed combination is a "tyrosine kinase inhibitor." Tyrosine kinases are proteins that "participate in diverse signalling pathways." (*Id.* at 5:39-40, J.A. 26.) Some of these pathways, according to the '512 patent, involve "the regulation of cell growth and differentiation," which are related to cancer. (*Id.* at 2:26-27, J.A. 24.) Although "[t]he signaling events responsible for the regulation of [DNA repair] . . . remain[ed] unclear" in 1994, the time of the alleged invention, (*id.* at 1:35-37, J.A. 24), the '512 patent speculated that there were "pathways connecting DNA damage and phosphorylation by tyrosine kinases[]." (*Id.* at 1:21-23, J.A. 24.) The '512 patent hypothesized that inhibiting tyrosine kinases might therefore "increas[e] the sensitivity of cells to damage from . . . DNA damaging agents" (*id.* at 3:1-3, J.A. 25) and "improve[] chemotherapeutic intervention." (*Id.* at 4:26, J.A. 25.)

The '512 patent does not disclose the use of any of its claimed combinations in humans or any other animals. Instead, it describes the results of experiments conducted *in vitro* in cancer cells (i.e., in test tubes). These experiments studied the activity of a particular class of tyrosine kinases, called the Src family, in response to a chemotherapeutic DNA damaging agent called mitomycin C and two tyrosine kinase inhibitors, called herbimycin A and genistein. (*Id.* at 9:4-

18:12, J.A. 28-32.) None of the studies disclosed in the '512 patent measured inhibition of cell proliferation or showed an increase in cell death.

The claims that are at issue in this case—claims 1-3, 5, and 6 (the "Asserted Claims")—generally follow a standard five-part structure. First, they include a preamble that describes the intended result of the claimed treatment method. Second, they include a step (a) requiring that a "chemotherapeutic DNA damaging agent" be "administered" to a patient. Third, they include a step (b) requiring that a "low molecular weight tyrosine kinase inhibitor" be "administered" to the patient. Fourth, they include functional language describing what the chemotherapeutic DNA damaging agent and the tyrosine kinase inhibitor must do (the "mechanism of action steps"). And finally, they close with a "thereby" clause that repeats the statement of intended result from the preamble.[2] An exemplary claim is shown below.

| '512 Patent, Claim 1 (J.A. 36) ||
|---|---|
| *Preamble* | A method of improving chemotherapeutic intervention in a patient, the method comprising: |
| *"Administering" Step (a)* | (a) administering a chemotherapeutic[3] DNA damaging agent to the patient; |
| *"Administering" Step (b)* | (b) administering a therapeutically effective amount of a low molecular weight tyrosine kinase inhibitor to the patient, |
| *Mechanism of Action Steps* | wherein the low molecular weight inhibitor binds intracellularly to inhibit the activity of more than one tyrosine kinase protein, and wherein the agent and the inhibitor act in combination by effecting a series of intracellular events to enhance cell death, |
| *"Thereby" Clause* | thereby improving chemotherapeutic intervention. |

---

[2] Claim 5 lacks a closing "thereby" clause but otherwise follows this general format.

[3] As originally issued, the claims lacked "chemotherapeutic." This word was added to each claim by a Certificate of Correction dated February 22, 2011. (J.A. 37.)

Because the '512 patent "relates generally to the field of biochemical pathways" (*id.* at 1:20-21, J.A. 24) and cancer treatment, a person of ordinary skill in the art of this patent would have held an M.D. or Ph.D. in molecular biology, biochemistry, pharmacology, or a related field and have had several years of experience working in cancer research in 1994 (i.e., the year of the alleged invention).

## LEGAL STANDARD

A patent's claims "define[] the scope of the patentee's rights." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). Interpreting the claims is a fundamental element of a patent infringement case. *See id.* at 384. Claim construction is a question of law, informed by the intrinsic evidence, as well as by the extrinsic evidence where necessary to understand "the background science or the meaning of a term in the relevant art during the relevant time period." *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 838, 841 (2015).

Claim construction explains patent claim terms, but "[c]ourts cannot rewrite claim language." *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1383 (Fed. Cir. 2008). Instead, the goal is to "give effect to the terms chosen by the patentee." *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999). The Federal Circuit articulated the framework for claim construction in its *en banc* opinion in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc).

*Phillips* establishes two overarching principles. The first is that claims are construed as they would be understood by "a person of ordinary skill in the art . . . at the time of invention"— here, 1994—reading the patent as a whole. *Phillips*, 415 F.3d at 1312-14 (internal quotation marks omitted). The second is that intrinsic evidence—that is, evidence that is internal to the

patent, including its claims, specification,[4] and prosecution history—is more compelling than extrinsic evidence, such as dictionary definitions and expert testimony. *Id.* at 1314-19.

*Phillips* also sets forth the framework for evaluating claim construction arguments and evidence. Claim construction begins with the language of the claims themselves. The claims "define the invention to which the patentee is entitled the right to exclude." *Id.* at 1312. The specification provides context for the claims and "is the single best guide to the meaning of a disputed term," *id.* at 1315, particularly where that term is unclear on its face or is of a technical nature, *see id.* at 1315-17. The specification "may reveal a special definition given to a claim term by the patentee." *Id.* at 1316. "A claim term may be clearly redefined without an explicit statement of redefinition." *Id.* at 1321 (internal quotation marks omitted); *see also Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1330 (Fed. Cir. 2012) ("This clear expression need not be *in haec verba* but may be inferred from clear limiting descriptions of the invention in the specification or prosecution history."). But, in all instances, redefinition must be clear: "one of the cardinal sins of patent law" is "reading a limitation from the written description into the claims." *Phillips*, 415 F.3d at 1320 (internal quotation marks omitted).

Less probative, but also necessary to consult, is the final piece of the intrinsic record—the patent's prosecution history. This "consists of the complete record of the proceedings before the [Patent Office] and includes the prior art cited during the examination of the patent." *Id.* at 1317. Although the prosecution history "often lacks the clarity of the specification and thus is less useful for claim construction purposes," it "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution." *Id.*

---

[4] A patent's specification is its body, i.e., the claims along with all of the figures and the written description that precedes the claims.

If a court deems the intrinsic record sufficient to resolve a dispute, extrinsic evidence—like dictionary definitions and expert testimony—need not be consulted. *Id.* Where extrinsic evidence is consulted, it must be given less weight than intrinsic evidence. *Id.* at 1318. Relatedly, "[a] party cannot transform into a factual matter the internal coherence and context assessment of the patent simply by having an expert offer an opinion on it." *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1342 (Fed. Cir. 2015).

## ARGUMENT

### I. The parties are in agreement with respect to eight claim terms.

Defendants and Plaintiffs have reached agreement on how five discrete claim terms should be construed. The parties have also agreed that the Asserted Claims' two preambles and concluding "thereby" clause are non-limiting. These eight agreed-upon constructions are:

| Claim Term | Agreed-Upon Construction |
|---|---|
| "intracellular" / "intracellularly" | "within a cell or cells" |
| "apoptosis" | "a series of intracellular events that lead to target cell death" |
| "low molecular weight" | "having a molecular weight less than 900 g/mol" |
| "chemotherapeutic DNA damaging agent" | "any chemical compound that induces DNA damage when applied to a cell" |
| "downstream effector molecules" | "molecules downstream in a signaling pathway" |
| "A method of improving chemotherapeutic intervention in a patient" | Non-limiting |
| "A method of enhancing apoptosis of cancer cells in a patient comprising chemotherapeutic intervention in a patient" | Non-limiting |
| "thereby improving chemotherapeutic intervention" | Non-limiting |

## II. The '512 patent's broad use of "patient" encompasses a "human or animal."

| Claim Term | Defendants' Proposal | Plaintiffs' Proposal |
|---|---|---|
| "patient" | **"human or animal"** | *"the recipient of any of various personal care services"* |

"Patient" appears three times in each of the claims—in the preamble and in each of the two "administering" steps. The claims, read in light of the specification and other intrinsic evidence, make clear that "patient" encompasses both animals and humans, which is consistent with the term's plain and ordinary meaning.[5]

The claims themselves provide no restrictions on the species of a "patient." Nothing modifies "patient" in any of the claims. Nor does any use of the term in the claims limit its meaning to humans. On the face of the claims, then, the meaning of "patient" includes both animal and humans. *See Novo Nordisk v. Eli Lilly & Co.*, No. 98-cv-643, 1999 WL 1094213, at *17 (D. Del. Nov. 18, 1999) ("If [the patent owner] had desired to limit the claims to 'human patients,' it could have used that language instead of 'patient.' Since [the patent owner] chose to use the broader term[] . . . 'patient,' the scope of the claims should reflect its choice of words [and encompass animals generally].").

Moreover, this reading finds express support in the specification. The specification states that "[t]he present invention also provides advantageous methods for treating cancer that, generally, comprise administering to an ***animal or human patient*** with cancer a therapeutically effective combination of a DNA damaging agent and a tyrosine kinase inhibitor." ('512 patent at 5:50-54, J.A. 26 (emphasis added).) Thus, one skilled in the art would understand that, in the context of the '512 patent, a "patient" can be either an "animal or human."

---

[5] Humans, of course, are animals. But, unless indicated otherwise, "animals" as used in this section refers to non-human animals.

– 8 –

The remainder of the specification is consistent in conveying that the alleged invention applies broadly to animals, human or otherwise. (*See, e.g.*,'512 patent at 4:20-21, J.A. 25 (referring to "**an animal or human** subject" (emphasis added)); *id.* at 5:54-55, J.A. 26 ("[c]hemical DNA damaging agents and/or inhibitors may be administered to **the animal**" (emphasis added)); *id.* at 5:64-67, J.A. 26 ("administering to **the animal** a therapeutically effective amount of a pharmaceutical composition" (emphasis added)).) Even where the word "animal" is not used, the specification implies that a non-human qualifies as a "patient" under the claimed methods of treatment. For example, the description of preferred embodiments explains that "[t]he person responsible for administration . . . determine[s] the appropriate dose of [DNA damaging agent for] the individual subject[,] [and] [m]oreover, **for human administration**, preparations should meet . . . FDA Office of Biologics standards." (*Id.* at 18:30-34, J.A. 32 (emphasis added).) The patent would not need to distinguish dosage standards for human administration unless it also envisaged non-human administration.

The specification is thus clear: "patient," as used in the '512 patent, includes both humans and animals. The prosecution history says nothing to the contrary. The Court should therefore adopt Defendants' proposed construction to avoid improperly narrowing the scope of the claims. *See Trustees of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1366 (Fed. Cir. 2016) ("[T]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." (internal quotation marks omitted)); *see also Novo Nordisk*, 1999 WL 1094213, at *18 (concluding that "patient" in a patent claim to a method of treating diabetes meant "an animal, including a human being, awaiting or under medical treatment").

Plaintiffs' proposed construction, "the recipient of any of various personal care services," is vague, lacks any support whatsoever in the specification and other intrinsic evidence, and does little to resolve the essence of the parties' dispute—i.e., whether "patient" is narrowly limited to only humans. That is the question that the Court must resolve. *See, e.g.*, *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) ("When the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute."). The intrinsic record makes clear that the claims include both humans and other animals, and the Court should adopt Defendants' proposed construction to clearly and definitively resolve this issue.

### III. "A therapeutically effective amount" means "an amount that would be sufficient to have a desired therapeutic effect."

| Claim Term | Defendants' Proposal | Plaintiffs' Proposal |
|---|---|---|
| "a therapeutically effective amount" | *"an amount that would be sufficient to have a desired therapeutic effect"* | *"an amount that is effective to kill cells"* |

Every Asserted Claim recites "administering *a therapeutically effective amount* of a low molecular weight tyrosine kinase inhibitor." (*See, e.g.*, '512 patent at 25:5-6, J.A. 36 (emphasis added).) Defendants propose a construction that is consistent with the term's plain and ordinary meaning in the art—"an amount that would be sufficient to have a desired therapeutic effect"— and consistent with how the term is used within the context of the claims. In contrast, Plaintiffs propose a construction that would improperly narrow the claims by requiring that the amount of the tyrosine kinase inhibitor alone be effective to kill cells. Plaintiffs' attempt to narrow the claims should be rejected and Defendants' construction should be adopted.

### A. Defendants' construction reflects the plain and ordinary meaning.

The plain and ordinary meaning of "a therapeutically effective amount" is "an amount that would be sufficient to have a desired therapeutic effect." This is a common term in pharmaceutical patents, and many courts have construed it accordingly. For example, the Southern District of New York, confronted with a patent claiming "a therapeutically effective amount" of a molecule called calcitonin, concluded that "the plain meaning suggests that the term should be construed . . . as 'an amount of calcitonin sufficient to produce a desired therapeutic effect.'" *Novartis Pharms. Corp. v. Apotex Corp.*, No. 02 Civ. 8917, 2006 WL 626058, at *4 (S.D.N.Y. Mar. 13, 2006); *see also Astra Aktiebolag v. Andrx Pharms., Inc.*, 222 F. Supp. 2d 423, 481 (S.D.N.Y. 2002) ("'Therapeutically effective amount' means an amount that is effective in therapy, or an amount sufficient to provide a therapeutic effect."). The Districts of Delaware and New Jersey have adopted similar constructions for related terms, finding that "therapeutically effective concentration" means "blood plasma level of drug that ameliorates a symptom," *Acorda Therapeutics v. Alkem Labs. Ltd.*, No. CV 14-882-LPS, 2016 WL 1045356, at *3 (D. Del. Mar. 16, 2016); that "therapeutically effective blood levels" means "blood levels sufficient to produce a therapeutic effect," *id.*; and that a proposed construction of "therapeutically effective amount" that limited the term to a specific therapeutic effect was "somewhat inconsistent with the ordinary meaning of the term," *AstraZeneca AB v. Dr. Reddy's Labs., Ltd.*, No. CIV.A.05-5553 JAP, 2010 WL 1981790, at *9 (D.N.J. May 18, 2010) (declining to construe the term and opting for its "ordinary meaning"). None of these courts has required a "therapeutically effective amount" to have a *particular* therapeutic effect; they merely require it to have *some* therapeutic effect.

Accordingly, as numerous courts have recognized, "an amount that would be sufficient to have a desired therapeutic effect" is consistent with the plain and ordinary meaning of "a therapeutically effective amount."

### B. Nothing in the specification is contrary to the ordinary meaning of "therapeutically effective amount."

The Asserted Claims recite a "therapeutically effective amount of a low molecular weight tyrosine kinase inhibitor." The intrinsic evidence provides no reason to deviate from the widely recognized ordinary meaning of "therapeutically effective amount" in this context. Indeed, the specification never even mentions a "therapeutically effective amount" of a tyrosine kinase inhibitor alone. Where the '512 patent's specification refers to a "therapeutically effective amount" at all, it does so only with respect to a combination of drugs, and therefore does not inform interpretation of the actual claim language.

Specifically, the '512 patent purports to define a "therapeutically effective amount" as an "amount of a DNA damaging agent *and* tyrosine kinase inhibitor that, when administered to an animal *in combination*, is effective to kill cells within the animal." ('512 patent at 4:16-19, J.A. 25 (emphases added).) This definition, which Plaintiffs contend should be controlling for the use of "therapeutically effective amount" in the claims, refers to an amount of a combination—i.e., a collective amount of DNA damaging agent *and* tyrosine kinase inhibitor that, when administered together, has a certain effect. Thus, this language is not applicable to interpreting the claimed "therapeutically effective amount" of a *single agent*—the tyrosine kinase inhibitor.

Because the specification's definition of "therapeutically effective amount" does not apply to the context in which the term is used in the claims, it should not control. "To act as its own lexicographer," such that the definition in the specification is controlling for the claims, "a

– 12 –

patentee must clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning." *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (internal quotation marks omitted). That definition must "appear with reasonable clarity, deliberateness, and precision." *Abbott Labs. v. Syntron Bioresearch, Inc.*, 334 F.3d 1343, 1354 (Fed. Cir. 2003) (internal quotation marks omitted). Most importantly, to meet this standard, the patentee "***must use words in the same way in the claims and in the specification***." *Fonar Corp. v. Johnson & Johnson*, 821 F.2d 627, 632 (Fed. Cir. 1987) (emphasis added), *abrogated on other grounds by Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 95 (1993). Here, the '512 patent's specification uses "therapeutically effective amount" to refer to an amount of a combination, but the claims use it to refer to an amount of only a single agent. The words in the claims and the specification are therefore being used in different ways. Accordingly, the specification does not provide a clear definition of the term as used in the claims that can overcome the presumption of interpreting claims according to their plain and ordinary meaning. *See, e.g.*, *Thorner*, 669 F.3d at 1368 (holding that if a definition in the specification "does not rise to the level of . . . lexicography," then "the term . . . should be given its plain and ordinary meaning"); *IGT v. Bally Gaming Int'l, Inc.*, 659 F.3d 1109, 1119 (Fed. Cir. 2011) ("The patentee did not act as its own lexicographer . . . to cause a departure from the plain and ordinary meaning[.]").

Indeed, the claim language itself confirms that definitional language in the specification regarding a combination as a whole should not be read into the claimed "therapeutically effective amount" of a tyrosine kinase inhibitor. The Asserted Claims already expressly recite intended effects of the drug combination, e.g., "wherein the agent and the inhibitor act in combination by effecting a series of intracellular events to enhance cell death" (claim 1), "wherein the agent and

the inhibitor act in combination to enhance cell death" (claims 2 and 3), "wherein the agent and the inhibitor act in combination to enhance apoptosis" (claim 5), and "wherein the agent and the inhibitor act in combination to alter the cell's response to the agent" (claim 6). Thus, reading into the claims an effect of the combination via "therapeutically effective amount" of a low molecular weight tyrosine kinase inhibitor would be inconsistent—and redundant—with the plain language of the claims.

"Therapeutically effective amount" should therefore be construed according to its plain and ordinary meaning. Plaintiffs' assertion to the contrary should be rejected.

## CONCLUSION

For the reasons discussed above, Defendants respectfully request that the Court adopt their proposed constructions for each disputed term and enter an order that the terms in the Asserted Claims of the '512 patent be construed as follows:

| Claim Term | Construction |
|---|---|
| "intracellular" / "intracellularly" | *"within a cell or cells"* <br> (agreed upon) |
| "apoptosis" | *"a series of intracellular events that lead to target cell death"* <br> (agreed upon) |
| "low molecular weight" | *"having a molecular weight less than 900 g/mol"* <br> (agreed upon) |
| "chemotherapeutic DNA damaging agent" | *"any chemical compound that induces DNA damage when applied to a cell"* <br> (agreed upon) |
| "downstream effector molecules" | *"molecules downstream in a signaling pathway"* <br> (agreed upon) |

– 14 –

| Claim Term | Construction |
|---|---|
| "A method of improving chemotherapeutic intervention in a patient" | *Non-limiting* (agreed upon) |
| "A method of enhancing apoptosis of cancer cells in a patient comprising chemotherapeutic intervention in a patient" | *Non-limiting* (agreed upon) |
| "thereby improving chemotherapeutic intervention" | *Non-limiting* (agreed upon) |
| "a therapeutically effective amount" | *"an amount that would be sufficient to have a desired therapeutic effect"* |
| "patient" | *"human or animal"* |

Dated: August 2, 2016

**Genentech, Inc.**

By: */s/ Todd H. Flaming*
     One of Its Attorneys

Todd H. Flaming
KRAUSFLAMING LLC
20 South Clark Street
Suite 2620
Chicago, Illinois 60603
(312) 447-7217 (Tel)
(312) 236-9201 (Fax)
Todd@KrausFlaming.com

Michael A. Jacobs
Matthew I. Kreeger
Matthew A. Chivvis
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105
(415) 268-7000 (Tel)
(415) 268-7522 (Fax)
MJacobs@mofo.com
MKreeger@mofo.com
MChivvis@mofo.com

**OSI Pharmaceuticals, LLC**

By: */s/ Todd H. Flaming*
     One of Its Attorneys

Todd H. Flaming
KRAUSFLAMING LLC
20 South Clark Street
Suite 2620
Chicago, Illinois 60603
(312) 447-7217 (Tel)
(312) 236-9201 (Fax)
Todd@KrausFlaming.com

Amy K. Wigmore
Amanda L. Major
WILMER CUTLER PICKERING
     HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6000 (Tel)
(202) 663-6363 (Fax)
Amy.Wigmore@wilmerhale.com
Amanda.Major@wilmerhale.com

                                         Emily R. Whelan
                                         Timothy A. Cook
                                         WILMER CUTLER PICKERING
                                             HALE AND DORR LLP
                                         60 State Street
                                         Boston, Massachusetts 02109
                                         (617) 526-6000 (Tel)
                                         (617) 526-5000 (Fax)
                                         Emily.Whelan@wilmerhale.com
                                         Tim.Cook@wilmerhale.com